INTERNATIONAL SILK GUILD, Inc., a New York Corporation, Appellant,

v.

William P. ROGERS, as Attorney General of the United States, as successor to the Alien Property Custodian, et al., Appellees.

William P. ROGERS, as Attorney General of the United States, as successor to the Alien Property Custodian, et al., Appellants,

v.

INTERNATIONAL SILK GUILD, Inc., a New York Corporation, Appellee.
Nos. 14150, 14151.

United States Court of Appeals
District of Columbia Circuit.

Argued May 13, 1958.

Decided Nov. 26, 1958.

Mr. Delmar W. Holloman, Washington, D. C., with whom Mr. James Lee Murphy, Washington, D. C., was on the brief, for appellant in No. 14150 and appellee in No. 14151.

Mr. Max Wilfand, Atty., Dept. of Justice, of the Bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, with whom Messrs. George B. Searls and Irwin A. Seibel, Attys., Dept. of Justice, were on the brief, for appellees in No. 14150 and appellants in No. 14151.

Before FAHY, WASHINGTON and DANAHER, Circuit Judges.

FAHY, Circuit Judge.

On October 31, 1942, the Alien Property Custodian, predecessor in interest of the Attorney General of the United States,[1] vested property of Asahi Silk Company, Ltd., a Japanese exporter of silk, referred to herein as Asahi Japan.[2] On December 15, 1942, the International Silk Guild, Inc., a nonprofit membership corporation of the United States, filed a debt claim with the Custodian under § 34 of the Trading with the Enemy Act,[3] against the Asahi Japan vested property.

---

[1]. The Attorney General, appellee in No. 14150 and appellant in No. 14151, succeeded to the Custodian's power and duties in October 1946. Exec.Order No. 9788, 50 U.S.C.A.Appendix, § 6 note, 11 Fed.Reg. 11981 (1946).

[2]. The vesting rested upon the authority of 40 Stat. 416 (1917), as amended, 50 U.S.C.App. § 7(c) (1952), 50 U.S.C.A. Appendix, § 7(c).

[3]. 60 Stat. 925 (1946), 50 U.S.C.App. § 34 (1952), 50 U.S.C.A.Appendix, § 34.

The controversy thus initiated has had a considerable history. The administrative proceedings in their earlier stages resulted in denial of the claim by the Custodian, who disagreed with his Hearing Examiner. The Guild then took the matter to the District Court, which originally agreed with the Custodian and dismissed the Guild's complaint. Thereafter, however, the court vacated its order of dismissal so as to permit newly discovered evidence to be offered before the Custodian under § 34 (e) of the Act. In consequence, further administrative proceedings were had, ending in the Custodian again disallowing the claim. The matter again came to the District Court for review, and, this time, the court disallowed the claim in part and allowed it in part. The Guild in No. 14150 appeals from the disallowance and the Custodian, in No. 14151, from the allowance.

The purpose of the Guild is to promote the interests of the silk industry in the United States. It was incorporated in 1933 as a nonprofit organization and in the early years of its existence was financed by contributions from a group of American silk firms and by the Japanese silk industry. Membership was open to "any individual, firm, or corporation engaged in or having an interest in the silk industry or any branch thereof." Eight American importing subsidiaries of Japanese silk exporting houses were founder members; one of these eight was Asahi New York, a New York corporation substantially all of whose stock was owned by Asahi Japan.

The Japanese silk industry was organized under the name of the Central Raw Silk Association of Japan, a Japanese corporation. The corporation was composed of associations representing all segments of the industry, which included two exporter associations, one in Yokohama and one in Kobe. One of the eight Japanese exporters was Asahi Japan.

In December 1933, shortly after the organization of the Guild, the Central Raw Silk Association voted to establish a three-year overseas publicity campaign to promote the use of silk. The Guild was designated as the American agency to conduct the campaign in this country while The International Silk Committee of France was entrusted with a similar promotional campaign in France. During the early years of the campaign remittances were voluntarily made by the Association to the Guild to further the promotional activities.

In January 1937 a new method of financing the Guild was inaugurated whereby an assessment or charge of five yen was levied on each picul of silk —a bale of 132.3 pounds—exported from Japan. This assessment was added to the invoice and paid by the importer to the exporter. It seems clear from the record that the assessment was imposed by the Central Raw Silk Association and there is also no question that substantial remittances were made to the Guild from the proceeds of the assessments during the period from February through August 1937. Interruptions in remittances then occurred due to foreign exchange difficulties centering around the activities of the Japanese Finance Ministry. Further remittances were made, however, in October 1937 and continued with some irregularity until all remittances stopped after May 1940, except for one made in November 1940.

The Guild claim is for the amount the importers paid to Asahi Japan, an exporter, under the assessment plan, and not remitted to the Guild, namely, $65,326.39 together with interest. The Guild contends there was an oral contract between the Guild, the importers in the United States, and the exporters in Japan, the terms of which grew out of negotiations conducted by the Guild President, Paolino Gerli, during a trip to Japan in 1936. The Guild contends the evidence establishes that under this contract the exporters, after collecting the assessments from the importers, were to remit the proceeds to the Guild, though the mode of forwarding remittances was to be worked out by the ex-

porters according to their custom. Under the plan actually adopted in Japan the exporters paid the money to the Yokohama or the Kobe Exporters Association, which sent the funds to a Special Committee of the Central Raw Silk Association, which in turn forwarded to the Guild such remittances as were made.

The Custodian,[4] in his first decision, June 19, 1951, in a painstaking analysis of the relevant events, found no contractual commitment to the Guild on the part of the Japanese notwithstanding that in a general manner the Gerli assessment plan was followed. We think one aspect of his decision is decisive on the question of a contract. No exporter, including Asahi Japan against whose vested property the Guild claim is pressed, was shown to have agreed to do more after receipt of assessment payments than to forward them to the Exporters Association of Yokohama or Kobe for transmission to the Central Raw Silk Association. As the Custodian said, even if the Central Raw Silk Association was obligated to remit these funds to the Guild, this was not the obligation of Asahi Japan. And the Custodian was unable, as we are unable, to find identity between the exporters and the Central Raw Silk Association so as to give rise to a contractual arrangement binding the exporters themselves to the Guild.

The District Court dismissed the Guild's complaint which sought review of the Custodian's above-noted decision; the court thought the Guild had not established its right to receive the funds. As previously stated, however, the court vacated the ensuing judgment to permit newly discovered evidence to be received and the record was returned to the Custodian "to enable the parties to obtain further administrative consideration of the matter."

The reopening before the Custodian hinged upon the views of the District Court expressed in a Memorandum filed in connection with dismissal of the complaint; the court, International Silk Guild v. McGrath, D.C., 105 F.Supp. 766, 768, stated that "notwithstanding the absence of such agreement," alleged by the Guild,

"I would conclude that the claim should be allowed in view of the purpose and understanding on the part of the importers * * * paying the funds, if it were shown that such funds were in the hands of the exporters, in the instant case in the hands of Asahi, Japan, at the time of the vesting of that exporter's property * * *. To conclude otherwise would be to sanction an unjust enrichment contrary to the law of the State of New York, which is the critical law here applicable."

On the reopened proceedings the Custodian found that on October 31, 1942, the date of the vesting of its property, Asahi Japan was in possession of promotional funds in the amount of Y80,-323.09, of which Y35,208.75 had been returned by the Kobe Exporters Association on September 25, 1942, and Y45,-114.34 had been returned by Yokohama Raw Silk Exporters Association on September 22, 1942. Nevertheless the Custodian adhered to his earlier decision adverse to the Guild. He thought that while the Y80,323.09 in the hands of Asahi Japan were collected by Asahi to be used for promotional purposes and constituted an unjust enrichment, there was lack of proof that these funds belonged to the Guild; the unjust enrichment of Asahi could not be said to be at the expense of the Guild any more than at the expense of the French or any other organization which in the past had been the recipient of promotional funds.

This final decision of the Custodian came to the District Court for review on a supplemental complaint of the Guild. Seeming to hold that there was agreement as to the method of financing the

4. We refer for simplicity to the Custodian as including the Attorney General and the Deputy Director.

Guild,[5] the District Court in the end held against the Guild as to assessment funds which were not in the hands of Asahi Japan. Thus, both the Custodian and the District Court concluded that the Guild could not recover on a contract theory.

We think this decision must be sustained. There is evidence that no doubt is susceptible in some degree to an interpretation favorable to the contract theory. For example, Mr. Gerli testified that when he was en route from Japan in 1936 he received a cablegram to the effect that the Japanese exporters had accepted his plan, and there is supporting testimony of others, though given at hearings conducted years after the events transpired. But there is abundant evidence indicating that though the assessment plan was put into effect and operated for some time—the assessments were levied, paid, and eventually remitted in large part to the Guild —this procedure was not a matter of contractual obligation between the Guild and the exporters. It is the resulting uncertainty that prevents us from disagreeing with the Custodian and District Court as to their findings against the existence of a contractual obligation.

We are left with the question of the Guild's claim to funds in Asahi Japan's hands at the time of the vesting, either because the funds had been returned to it by the Yokohama and Kobe Exporters Associations or because they had been retained by Asahi Japan after collection from importers. Whichever of these courses were followed, it is clear, as we have seen, that Asahi Japan was in possession of promotional funds in the amount of Y80,323.09 on October 31, 1942, the date of the vesting. On the theory of unjust enrichment the District Court gave judgment for the Guild for the amount represented by these yen. The Custodian, as we have also seen, thought there was a lack of proof these funds belonged to the Guild. He was of the opinion that some part of them might have been remitted, e. g., to the French promotional organization, though he agreed that "the possession and retention of these funds, which were collected by Asahi Japan with the understanding that they were to be used for promotional purposes, constitutes an unjust enrichment." The divergence, then, between the Custodian and the District Court is on the issue whether the unjust enrichment was at the expense of the Guild.

We agree with the Custodian and the court as to the finding of unjust enrichment, and we agree with the court that the unjust enrichment was at the expense of the Guild. There is evidence these funds represented assessments on shipments of silk to the United States,[6] and that the assessments were paid by American importers, who were members of the Guild, for promotional purposes. The funds were in the hands of the exporter, Asahi Japan, which could not retain the proceeds for itself. The course of dealing between the three parties concerned, the importers, the exporter in whose hands the funds were, and the Guild, created a right in the Guild to the funds, unless a part were needed for incidental expenses of administration incurred by the Central Raw Silk Association, or unless some other promotional organization should share in the funds. No point is made as to incidental expenses and, as to a claim upon the funds by any other promotional organization, that possibility we think is too nebulous and uncertain to defeat the claim of the Guild. No such organization has asserted any claim whatever to any part of the funds.

5. The Memorandum of the District Court states:
   "There is no substantial evidence in the record to substantiate a finding that the Guild, the importers and the exporters did not agree to this method of furnishing income for a continuation of the work of the Guild, which was beneficial to all. * * *"

6. Lack of evidence that a very small percentage could not have been otherwise derived is not sufficient to turn the decision against the Guild.

In reaching its decision respecting the Y80,323.09 we think the District Court did not depart from the standard governing judicial review of the Custodian's contrary decision. The following appears in the court's second Memorandum Opinion,

"[N]or is there substantial evidence to support a finding that Asahi, Japan, was not indebted to the Guild for the monies thus collected by it, and in its hands at the time of the vesting of its property by the Alien Property Custodian."

In so ruling the court necessarily held that the Custodian's contrary finding, insofar as it might be considered to be factual, was clearly erroneous.[7]

Once the District Court found Asahi Japan obligated to pay the Guild Y80,323.09, it was confronted with the problem of converting the yen into dollars, for American courts are permitted to render judgments only in dollars. See § 20 of the Monetary Act of 1792, 1 Stat. 246, R.S. 3563, 31 U.S.C. § 371 (1952), 31 U.S.C.A. § 371; Bronson v. Rodes, 7 Wall. 229, 74 U.S. 229, 254, 19 L.Ed. 141; Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg, 2 Cir., 1951, 189 F.2d 952; Frontera Transp. Co. v. Abaunza, 5 Cir., 1921, 271 F. 199. As there was no exchange rate of yen into dollars during the war, the District Court made the conversion by use of the first official postwar rate of exchange, resulting in judgment for the Guild for $222.16.

Determination of the correct exchange rate poses a difficult problem in this case. We first must decide the time the obligation arose. We fix this as the date of the vesting of the property of Asahi Japan by the Custodian, namely, October 31, 1942. We arrive at this date because the yen were then in the hands of Asahi Japan and the obligation under the unjust enrichment theory had arisen; that is, the Guild was entitled to receive the amount of assessment proceeds then in the hands of Asahi Japan.[8] At the date of the vesting, however, Asahi Japan, we assume, could not make payment to the Guild because of the interruption of intercourse by reason of the war.

Since the obligation was to pay the Guild in dollars in the United States, which was the method of making remittances employed under the previous arrangements between the parties, the amount of the judgment now to be entered in dollars is to be ascertained as of the date of the breach of the obligation. Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168. Thus the case at bar is unlike Die Deutsche Bank v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383, and Zimmermann v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034, in both of which the rate of exchange existing on the date of judgment was used, on the theory that since the cause of action was entirely of foreign origin the debt was payable in foreign currency in the foreign country.

In Sutherland v. Mayer, 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943, the value at

---

7. We agree with the Custodian's position in this court that the standard of review in the District Court under section 34(e) of the Trading with the Enemy Act is that the findings of the Custodian should not be set aside unless clearly erroneous. This is so notwithstanding the fact that the court is authorized to take additional evidence. Such additional evidence may be considered in determining whether or not the Custodian's findings are clearly erroneous. In the present case, however, the court made its determinations upon the basis of the record before the Custodian.

And "the question is the same in this court as it was in the district court," Morris Plan Industrial Bank v. Henderson, 2 Cir., 1942, 131 F.2d 975, 977, that is, whether the findings of the Custodian are clearly erroneous.

8. The District Court fixed the dates as September 22 and 25, 1942, when, it said, the funds had been returned to Asahi Japan. For present purposes the difference between those dates and October 31, 1942, is immaterial.

which the foreign currency was to be translated into dollars was calculated at the exchange rate when commercial intercourse and communication between citizens of the United States and Germany was restored after the end of World War I. The suit was by the Alien Property Custodian to obtain assets involved in an accounting between an American and German partners. The assets principally were those in Germany when the war brought about dissolution of the partnership. The dissolution gave rise to an obligation on the part of the German partners to settle up the partnership affairs within a reasonable time and divide the proceeds of liquidation among the partners according to their respective interests. The Court pointed out, however, that a settlement with the American partner was legally impossible until the close of the war, because intercourse was forbidden. Upon review of the conduct of the German partners the Court was unable to conclude they conducted themselves in any manner hostile to the ultimate rights of the American partner or inconsistent with an honest effort to do the best thing with the property until the close of the war. The Court pointed out that with the exception of plant and machinery of relatively small value the German assets remained in the form of German currency, or securities, bills receivable, etc., convertible only into German paper currency. The Court then said that the loss in the final analysis was an "ineluctable consequence of the war"; the ordinary rule would not apply to the extraordinary conditions as a result of which money values were swept away by immense causes beyond the sway of the German partners.

"Blame for such a situation rests upon neither; and equality is equity." 271 U.S. at page 293, 46 S.Ct. at page 542. The Court concluded that the depreciation of the German mark was so great that to compute its American monetary value on a par basis would be to indulge in fiction. It was held, as we have said, that the American dollar value should be computed at the exchange value of marks in American money as of the time when commercial intercourse and, therefore, settlement, first became lawful, though the accounting had not then been concluded.

■ There are obvious factual differences in Mayer and our case; but these do not seem to us so great as to make inapplicable the underlying basis of the decision in Mayer. Here, too, intercourse, and, therefore, settlement, was impossible when the obligation arose. The value of the obligation was then represented by Japanese currency which, so far as we are aware, merged as such into the Japanese economy. The value is not shown to have taken the form of goods or materials which were preserved as such. Considering, also, the purpose of the assessments and the course of business between the Guild and Japanese exporters, including Asahi Japan, equity here as in Mayer seems to call for the same equality in sharing loss as was there imposed by the Supreme Court.[9]

■ It follows that the exchange value of yen at the time intercourse could be resumed should be used. Since the record shows no more favorable exchange rate existed at that time than the first official postwar rate of exchange, the court properly entered

9. We have considered the possibility of a different approach. As the Guild points out, in October 1942 there was an established exchange rate between yen and Swiss francs and between Swiss francs and dollars. The Guild argues that it is more equitable and hence more desirable to translate yen into dollars through the use of this means. A somewhat similar method was used in the English Court of Common Pleas in 1803; an indirect exchange rate was used in reaching the amount of a debt due in French Livres Tournois when there was no exchange rate between France and England due to war but there was between francs and Hamburg currency and between the latter and English pounds. See Pollard v. Herries, 127 Eng.Rep. 183 (C.P.). And see Bank Mizrahi, Ltd. v. Chief Execution Officer, Tel Aviv, 10 Palestine L.R. 364. By reason of Sutherland v. Mayer, supra, however, we conclude that we should not accept this possible approach.

judgment for the Guild in the sum of $222.16.

Affirmed.

WASHINGTON, Circuit Judge (concurring in part and dissenting in part).

I think the Custodian's denial of the International Silk Guild's claim in its entirety was well grounded in law and the evidence, and should be reinstated. But, if the Custodian's findings are to be held clearly erroneous, and the claim is to be allowed, the majority's determination of the exchange rate for conversion of yen into dollars seems to me entirely correct.

I would add only that it is not now in reality Asahi Japan's money which the Guild is seeking. Rather it is the money value of vested property now owned by the United States Government, which by the grace of Congress has been made available for payment of American creditors. Under the circumstances, where our Government is sued not as a wrongdoer, but simply by virtue of the statute, it should not be made to bear the risk of loss occasioned by the depreciation of the Japanese yen.