**COMPETEX, S.A. (In Liquidation), Plaintiff-Appellee,**

v.

**Ronald LABOW, Defendant-Appellant.**

**No. 329, Docket 85–7605.**

United States Court of Appeals, Second Circuit.

Argued Nov. 15, 1985.

Decided Feb. 12, 1986.

David Parker, New York City (David M. Levy, Olshan Grundman & Frome, New York, N.Y., on brief), for defendant-appellant.

Sheldon H. Elsen, New York City (Gary H. Greenberg, Lawrence M. Solan, John B. Orenstein, Orans, Elsen & Lupert, New York City, on brief), for plaintiff-appellee.

Before KAUFMAN, NEWMAN, and KEARSE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal presents issues concerning currency conversion in the context of enforcing a foreign judgment. Specifically, the question is whether a judgment debtor may satisfy an American judgment that was based on an English judgment by paying the amount of the English judgment in pounds. Defendant-appellant Ronald La-Bow appeals from an order of the District Court for the Southern District of New York (John E. Sprizzo, Judge), 613 F.Supp. 335, denying his motion under Fed.R.Civ.P. 60(b) for relief from the American judgment, previously entered by the late Judge Henry F. Werker in favor of plaintiff-appellee Competex, S.A. For reasons that follow, we affirm.

## Background

LaBow, a New Yorker, lost a substantial sum of money through speculation in copper on the London Metal Exchange. His broker, Competex, a Swiss corporation, satisfied these debts. Competex sued LaBow for breach of contract in the English High Court of Justice, Queen's Bench Division, and obtained a default judgment for £ 187,-929.82, which included principal, interest, and costs.

Competex then brought this diversity action to enforce the English judgment. Following a bench trial, Judge Werker held that the English judgment was entitled to recognition and enforcement. Because determination of the date on which to convert a foreign currency debt into dollars is a substantive question, *see Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865–67 (2d Cir.1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), Judge Werker was compelled to apply New York law. New York uses the breach-day conversion rule, *see Dougherty v. Equitable Life Assurance Society*, 266 N.Y. 71, 193 N.E. 897 (1934); *Parker v. Hoppe*, 257 N.Y. 333, 178 N.E. 550 (1931); *Richard v. American Union Bank*, 241 N.Y. 163, 149 N.E. 338 (1925); *Hoppe v. Russo-Asiatic Bank*, 235 N.Y. 37, 138 N.E. 497 (1923); *Brill v. Chase Manhattan Bank*, 14 A.D.2d 852, 220 N.Y.S.2d 903 (1st Dep't 1961); *Librairie Hachette, S.A. v. Paris Book Center, Inc.*, 62 Misc.2d 873, 309 N.Y.S.2d 701 (Sup.Ct.N.Y.Co.1970). *But see John S. Metcalf Co. v. Mayer*, 213 A.D. 607, 211 N.Y.S. 53 (1st Dep't 1925) (applying the judgment-day rule); *Sirie v. Godfrey*, 196 A.D. 529, 188 N.Y.S. 52 (1st Dep't 1921) (same).

In applying the breach-day rule, Judge Werker reasoned that Competex's American claim was based on the English judgment rather than on the underlying contract. Competex's American claim had therefore accrued upon the date of entry of the English judgment, and Judge Werker applied the conversion rate prevailing on that date: £ 1 = $2.20. He entered judgment for $583,201.78, which included interest and a fee award pursuant to Fed.R. Civ.P. 56(g).[1] LaBow noticed an appeal,

---

**1.** The fee award has been paid, with interest, in dollars and forms no part of the instant contro- versy.

which we dismissed *sua sponte* for failure to perfect. The appeal was never reinstated.

The pound depreciated substantially relative to the dollar between the dates of the English and American judgments. On the date of the American judgment, the conversion rate was: £1 = $1.50. The pound continued to depreciate. As a result, LaBow moved, pursuant to Fed.R.Civ.P. 60(b), for a clarification of the American judgment and a declaration that he could satisfy the American judgment by paying the underlying English judgment in pounds. While this motion was pending, LaBow borrowed the necessary funds and paid the English judgment, with interest, in pounds. Judge Sprizzo denied LaBow's Rule 60(b) motion and held that the American judgment could be satisfied only by paying the dollar amount specified in that judgment. He credited LaBow's payment against the American judgment at the conversion rate prevailing on the date of payment: £1 = $1.20. This calculation left a balance owing on the American judgment of approximately $236,000.[2] LaBow appeals the denial of his Rule 60(b) motion.

## Discussion

■ Because of the procedural posture of this case, we are faced with a narrow issue: whether Judge Sprizzo's denial of LaBow's Rule 60(b) motion was proper. Rule 60(b) is not a substitute for appeal. LaBow may not relitigate the bases for the enforcing judgment entered by Judge Werker. *See Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 60 (2d Cir.1984); *Daily Mirror, Inc. v. New York News, Inc.*, 533 F.2d 53, 56 (2d Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 140 (1976). Specifically, LaBow may not challenge Judge Werker's application of the breach-day conversion rule. However, review of the Rule 60(b) denial requires some exploration of the currency conversion problem because determination of a state's rule for deeming enforcing judgments satisfied turns on the rationale for the state's currency conversion rule.

For illustrative purposes, the following example will be helpful.[3] Defendant defaults on a contractual obligation to pay plaintiff £1. Plaintiff brings suit in an English court and receives judgment for that amount, at which time the prevailing conversion rate is: £1 = $1. For simplicity and to keep the discussion focused on the pertinent points, we assume that the value of the dollar remains constant (*i.e.*, constant against gold and all currencies except the pound) but that fluctuation in the value of the pound causes a change in the exchange rate for the dollar. Initially, we consider what would happen if the pound depreciates relative to the dollar, so that £1 = $.60. Plaintiff then brings an action on the English judgment in an American state court. We will further assume that defendant has sufficient property in both jurisdictions to satisfy any judgments against it.

If the English judgment is entitled to enforcement, a state court applying New York's breach-day rule would enter judgment for $1, in accordance with the conversion rate prevailing on the date the English judgment debt became due. The asserted purpose of this rule is to assure that plaintiff will be made whole by protecting him against fluctuation in relative currency values. *See Vishipco Line v. Chase Manhattan Bank, N.A., supra*, 660 F.2d at 866 n. 7. Thus, had defendant paid plaintiff £1 on the date of the English judgment and had plaintiff converted this amount into dollars on that date, plaintiff would be in possession of $1 on the date of the American judgment. On the surface, the breach-day rule appears to do no more than regard

---

**2.** The parties disagree on the exact amount of the balance with LaBow ($236,234.67), interestingly, claiming a higher amount that Competex ($236,089.68). Should this ultimately become an issue, we leave it for the District Court to resolve in the first instance.

**3.** Although we assume a judgment-on-a-judgment case, our analysis applies, *mutatis mutandis*, to a breach of contract case, on which the breach-day and judgment-day rules are based.

as done that which ought to have been done.

However, the breach-day rule does more than make plaintiff whole. It generously allows him to reap the benefit of appreciation in the value of the pound without risking loss as a result of the pound's depreciation. In our example, plaintiff was insulated from any loss as a result of the pound's depreciation. His right to receive $1 was completely unaffected by the pound's depreciation. However, had the pound appreciated relative to the dollar, so that £1 = $1.30, plaintiff would simply have executed on the English judgment. He would receive £1, the equivalent of $1.30. Since the original obligation was worth only $1, plaintiff would make $.30 as a result of the pound's appreciation.[4]

Of course, this game of creditor's choice is possible only if the judgment debtor has property in both jurisdictions sufficient to satisfy either judgment. The proposed *Restatement of Foreign Relations Law* suggests a more extreme rule of creditor's preference that can enable the creditor to benefit from currency fluctuations even if the debtor does not have property in both jurisdictions.[5] *See Restatement of Foreign Relations Law of the United States* § 823 comment c (Tent. Draft No. 6, 1985). According to the Restatement, if the for-

eign currency has depreciated since the foreign obligation accrued, an American court should follow the breach-day rule and apply the conversion rate prevailing at the time of accrual. In our example, if the value of £1 goes from $1 to $.60, the American court enters judgment for $1, and plaintiff loses nothing as a result of the pound's depreciation. However, if the foreign currency appreciates, an American court, according to the Restatement, should follow the judgment-day rule and apply the conversion rate prevailing on the date of the American judgment.[6] In our example, if the value of £1 goes from $1 to $1.30, the American court enters judgment for $1.30, and plaintiff makes $.30. Thus, under the Restatement's approach, the judgment debtor need not have property in England for the judgment creditor to be allowed to engage in currency speculation without risk.

It might be argued that the judgment debtor can avoid these unfavorable consequences by immediately satisfying the first judgment. Indeed, it could be argued that these consequences are fitting punishment for failure to pay debts justly due. However, these arguments assume that the original judgment is valid and enforceable. It might be that the original judgment is arguably not entitled to foreign recognition.[7] There is no justification for forcing

---

**4.** If the judgment debtor has property only in the United States, then the breach-day rule is one of neutrality rather than creditor's choice. If £1 = $1 on the date of the English judgment, the judgment creditor will receive an American judgment for $1 whether the pound appreciates or depreciates. Because the judgment creditor cannot execute in England to collect an appreciated pound (in which event he would have made $.30), he is not able to benefit from that appreciation.

**5.** Remarkably, the Restatement does so after stating, "Neither party should receive a windfall nor be penalized as a result of currency conversion." *Restatement of Foreign Relations Law of the United States* § 823 comment c (Tent. Draft No. 6, 1985).

**6.** The Restatement suggests that any jurisdiction adopting its approach may choose between the judgment-day and payment-day rules in cases where the currency of the original judgment has appreciated. Since the choice is made when the

enforcing judgment is entered, use of either rule allows the judgment creditor to benefit from the appreciation that has occurred without risking loss.

**7.** The grounds on which foreign judgments may be refused recognition vary among jurisdictions. *See generally* E. Scoles & P. Hay, *Conflict of Laws* §§ 24.33–24.37 (1982). Although the majority rule is to the contrary, *see, e.g., Toronto-Dominion Bank v. Hall,* 367 F.Supp. 1009, 1013–14 (E.D.Ark.1973); *Scott v. Scott,* 51 Cal.2d 249, 331 P.2d 641 (1958); *Johnston v. Compagnie Generale Transatlantique,* 242 N.Y. 381, 152 N.E. 121 (1926); *In re Christoff's Estate,* 411 Pa. 419, 192 A.2d 737 (1963), some jurisdictions continue to follow *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), in refusing to accord preclusive effect to judgments of foreign states that deny such effect to American judgments, *see* Mass.Ann.Laws ch. 235, § 23A (Michie/Law Co-op. 1974); N.H.Rev.Stat.Ann. § 524:11 (1973). Under the Uniform Foreign

defendant to choose between waiving all defenses to the enforcement action by satisfying the original judgment and assuming the risk of currency fluctuation.[8] Moreover, post-judgment interest, which compensates the judgment creditor for the time value of money, is ordinarily the only "punishment" for delay in paying judgment debts.

The gamesmanship of the breach-day rule can be avoided by selecting a conversion rule of general application that is neutral between the parties with respect to currency fluctuation. There are three methods by which neutrality can be achieved, depending on whether the original or the enforcing judgment is viewed as primary. If the original judgment is viewed as primary, which seems theoretically superior, neutrality can be achieved, first, by entering the enforcing judgment in the currency of the original jurisdiction (foreign-currency-judgment rule) or, second, by entering the enforcing judgment for an amount of dollars to be determined by converting the original judgment into dollars as of the date of payment (payment-day rule). If the enforcing judgment is viewed as primary, the third method for achieving neutrality is by converting the original judgment into dollars as of the date of the enforcing judgment (judgment-day rule).

Entry of judgment in a foreign currency is allowed in England, *see Miliangos v. George Frank (Textiles) Ltd.*, [1975] 3 All E.R. 801 (H.L.), France, and Germany, *see* E. Scoles & P. Hay, *Conflict of Laws* § 24.40 (1982). Despite the obvious appeal of this approach, which preserves the original judgment inviolate and places on both parties the risk of fluctuation in the value of the currency of the original judgment, it has received little support in the United States for a procedural reason. Most American courts have assumed that American judgments must be entered in dollars. This assumption has rested on either common law notions of sovereignty, *see Hicks v. Guinness*, 269 U.S. 71, 72, 46 S.Ct. 46, 70 L.Ed. 168 (1925); *Frontera Transportation Co. v. Abaunza*, 271 F. 199, 202 (5th Cir.1921); *Liberty National Bank v. Burr*, 270 F. 251, 252 (E.D.Pa.1921), or, at least in part, on the now repealed section 20 of the Coinage Act of 1792, *see International Silk Guild, Inc. v. Rogers*, 262 F.2d 219, 224 (D.C.Cir.1958); *Shaw, Savill, Albion & Co. v. The Fredericksburg*, 189 F.2d 952, 954 n. 5 (2d Cir.1951). This assumption probably deserves reexamination in light of the repeal of section 20.[9]

Money-Judgments Recognition Act of 1962, 13 U.L.A. 271 (1975), in force in nine states, recognition may be refused because: the tribunals of the rendering jurisdiction do not employ procedures comporting with due process, the rendering Court lacked jurisdiction over the person or subject matter, the judgment was obtained by fraud, the foreign court was a seriously inconvenient forum, the judgment conflicts with another judgment, or the judgment violates the public policy of the forum. *Restatement (Second) of Conflict of Laws* § 98 (1971) would allow recognition only of foreign judgments rendered in "contested proceeding[s]."

8. This point would seem even stronger in the breach-of-contract context than in the judgment-on-a-judgment context. There is no reason to require a defendant to pay a plaintiff merely because the plaintiff has a colorable contract claim.

9. Section 20, now repealed, was formerly codified at 31 U.S.C. § 371, and stated:

> The money of account of the United States shall be expressed in dollars or units, dimes or tenths, cents or hundredths, ... and all accounts in the public offices and all proceedings in the courts shall be kept and had in conformity to this regulation.

Even before its repeal, doubt was expressed as to whether section 20 prohibited entry of judgments in foreign currencies. *See Baumlin & Ernst, Ltd. v. Gemini, Ltd.*, 637 F.2d 238, 244 n. 9 (4th Cir.1980); Becker, *The Currency of Judgment*, 25 Am.J.Comp.L. 152, 157–58 (1977). When the Coinage Act was reenacted without the units of account passage, the House Judiciary Committee noted that the statute expressed no view on the validity of judgments specifying payment in foreign currencies. *See* H.R.Rep. No. 651, 97th Cong., 2d Sess. *reprinted in* 1982 U.S. Code Cong. & Ad. News 1895, 2040–41. It has therefore been suggested that such judgments are permissible. *See Restatement of Foreign Relations Law of the United States* § 823(1) and comment b (Tent. Draft No. 6, 1985).

The payment-day rule is economically equivalent to the foreign-currency-judgment rule. Indeed, the House of Lords recognized that, although entry of an enforcing judgment in a foreign currency may be the purest method of preserving the original judgment, there comes a time when that type of enforcing judgment, if paid in local currency, must be converted into that currency, at which point the foreign-currency-judgment rule becomes the payment-day rule. That point is reached no later than the time of execution, when a decision must be made as to how many units of the local currency satisfy the judgment entered in a foreign currency. *See Miliangos v. George Frank (Textiles ) Ltd., supra.*[10] In France, the court has the option of adopting either the payment-day or judgment-day rule. *See In re James' Will,* 248 N.Y. 1, 5, 161 N.E. 201, 202 (1928). However, in the United States, there has been some concern that a judgment must be entered in dollars for a sum certain. *Cf.* Forms 31 and 32, Appendix of Forms to Fed.R.Civ.P. Although the Federal Rules contain no explicit obstacle to the entry of a judgment for an amount of dollars to be determined in the future (by reference to ascertainable figures), the payment-day rule has found little favor in this country.

American courts wishing to avoid the procedural objections to the foreign-currency-judgment or payment-day rules while choosing a neutral conversion rule may apply the judgment-day rule. *See Die Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926); *Paris v. Central Chiclera,* 193 F.2d 960 (5th Cir.1952); *Shaw, Savill, Albion & Co. v. The Fredericksburg, supra; B.V. Bureau Wijsmuller v. United States,* 487 F.Supp. 156 (S.D.N.Y.1979), *aff'd,* 633 F.2d 202 (2d Cir.1980); *Restatement (Second) of Conflict of Laws* § 144 (1971).[11] The neutrality of the judgment-day rule may be illustrated by a return to our example. If plaintiff holds an English judgment for £1 and the value of £1 depreciates from $1 to $.60 as of the date of the American judgment, the American court enters judgment for $.60, and plaintiff loses $.40. But that is merely the consequence of holding an obligation in pounds. Had plaintiff executed on his English judgment, he would

---

**10.** In approving use of the payment-day rule for enforcing judgments entered in England, the House of Lords selected as the "payment day" the day on which a court authorizes execution upon the English judgment. *See Miliangos v. George Frank (Textiles) Ltd., supra.* This practice removes any question of how many pounds must be turned over to the judgment creditor after the execution sale. The court, in authorizing execution, converts the enforcing judgment into the currency of the forum for a sum certain.

**11.** There is some question as to whether the judgment-day rule requires conversion as of the date the complaint is filed in the enforcing action, *see In re James, supra,* or as of the date the enforcing judgment is rendered, *see Restatement of Foreign Relations Law of the United States* § 823 comment d(ii) (Tent.Draft No. 6, 1985). It could be argued that selecting the date of entry of judgment permits abuse because a party that perceives the existence of a favorable trend in currency values will obstruct the judicial process to delay entry of judgment. Suppose that the value of the pound is expected to appreciate over a six-month period from $1 to $1.30. If the plaintiff holds an English judgment for £1, he might be expected to delay entry of the American judgment for six months so that judgment is ultimately entered for $1.30.

However, if the plaintiff is confident of his prediction of currency trends, he need not delay the American action to protect himself. He can simply obtain and collect a $1 judgment immediately and use it to buy £1. At the end of six months, if his prediction is accurate, he can exchange the pound for $1.30. Nor does the defendant have an incentive to delay the entry of judgment if he believes the pound will depreciate relative to the dollar. If he expects the value of the pound to fall from $1 to $.60 over a six-month period, and he is in possession of £1, he is unconcerned about the change in the conversion rate. Whatever the final dollar amount of the American judgment, he can satisfy it by tendering his pound (or its equivalent in dollars) on the day the judgment is entered. Thus, both parties can protect themselves against fluctuation in the value of the pound by holding pounds in the interim period. Selecting the actual date of entry of judgment when applying the judgment-day rule, therefore, does not permit abuse. *See* Rifkind, *Money as a Device for Measuring Value,* 26 Colum.L.Rev. 559, 568–69 (1926). Since the date of judgment is the time when plaintiff's obligation in pounds is transformed into an obligation in dollars, the date of judgment approach seems superior.

have lost the equivalent of $.40 as a result of the pound's depreciation. Conversely, if the value of £1 appreciates from $1 to $1.30, the American court enters judgment for $1.30, and plaintiff makes $.30, the equivalent of what he would have made had he executed on the English judgment. Thus, the judgment-day rule allows the plaintiff to speculate in pounds for as long as he wishes, but he now engages in true speculation. His gains and losses are registered with equal force in England and in the United States, and any incentive for forum shopping disappears.[12] After entry of the American judgment, the judgment creditor is insulated from fluctuation in the value of the pound but takes the risk of fluctuation in the value of the dollar. But that is merely the consequence of holding a judgment in dollars.

If we were free to choose a conversion rule, we would select either the judgment-day or the payment-day rule. However, as noted, we are not free to do so because the conversion question is one of New York law and because we are reviewing only the denial of LaBow's Rule 60(b) motion. Our task is to predict what satisfaction of judgment rule New York would apply.[13]

■ Bearing in mind the consequences previously discussed of the various possible conversion rules, we believe that New York's choice of the breach-day conversion rule clearly implies that New York would require satisfaction of a New York enforcing judgment by payment of the dollar amount specified in that judgment and would not consider an enforcing judgment satisfied by payment of the amount of the underlying judgment in foreign currency. The breach-day rule protects the judgment creditor against fluctuation in currency values to the point of allowing him to speculate without risk. It would be anomalous to suggest that New York would allow its creditor's preference rule to be undercut by giving the judgment debtor the opportunity to satisfy his New York judgment by paying the underlying judgment in depreciated pounds.[14] Therefore, Judge Sprizzo was correct in holding that Competex's American judgment could be satisfied only in dollars. As a corollary, any pounds paid must be credited in dollars at the rate prevailing on the date the pounds were paid.[15]

**12.** The conservative judgment creditor who wishes to delay enforcing his English judgment, for reasons independent of currency fluctuation, may avoid the risk of speculation by borrowing an amount in pounds equal to the judgment debt due. Any increase or decrease in the value of the English judgment will then be offset by a corresponding change in the cost of repayment of the loan. Moreover, it should be noted that the judgment debtor may not similarly avoid all the consequences of the breach-day rule. If he lends or invests in pounds in an amount equal to the judgment debt and the pound appreciates, the increased cost of paying the judgment is offset by the increased value of his investment. However, if the pound depreciates, the decreased value of his investment (in pounds) is not offset by any reduction in the cost of repayment (in dollars).

**13.** The parties assume, and we assume, that New York law applies to the satisfaction question. We note that, even though selecting a conversion rule is a state law question, determining whether a federal judgment is satisfied may be a question of federal law. Somewhat analogous is the rule, adopted by two circuits, that fixing the rate of post-judgment interest in a diversity case is a federal question. *See G.M. Brod & Co. v. United States Home Corp.,* 759

F.2d 1526, 1542 (11th Cir.1985); *Weitz Co. v. Mo-Kan Carpet, Inc.,* 723 F.2d 1382, 1385–87 (8th Cir.1983). However, as we develop *infra,* selecting a satisfaction rule depends upon the conversion rule applied. Therefore, were we to view satisfaction as a federal question, we would adopt New York's law. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

**14.** The same result is reached if we adopt the assumption of note 4, *supra,* that the debtor has property only in New York. Under these conditions, the breach-day rule is neutral. In our example, the judgment creditor receives $1 whether the pound appreciates or depreciates. To allow the judgment debtor to extinguish his obligation by paying pounds after the pound has depreciated in value would defeat the rule's policy of neutrality.

**15.** A jurisdiction following the judgment-day rule would also require its enforcing judgments to be paid in local currency. In our example, this rule views the underlying obligation as being held in pounds until an enforcing judgment is entered. Then the obligation is held in dollars. As a corollary of the judgment-day rule, any pounds paid and credited against the Ameri-

LaBow contends that our holding is contrary to the principle that a judgment debtor can prevent entry of an enforcing judgment by satisfying the original judgment. *See, e.g., United States National Bank v. United States,* 23 F.2d 927 (S.D.Tex.1928). However, once an enforcing judgment is entered, a new obligation in dollars is created, and jurisdictions that follow the breach-day or the judgment-day rule view this enforcing judgment as primary. Where that judgment is regarded as primary, the opportunity to prevent its *entry* by paying in pounds does not imply the right to *satisfy* it by paying in pounds.

■ LaBow also contends that our holding is contrary to the general rule of nonmerger in a judgment-on-a-judgment case:

> j. *Merger in a judgment on a judgment.* When the plaintiff has obtained a judgment against the defendant and brings an action upon the judgment, and obtains a judgment in that action, the first judgment is not merged in the second judgment, whether the second action is brought in the same State in which the first judgment was rendered or is brought in another State. The plaintiff can enforce either judgment by execution or otherwise, but satisfaction of one of the judgments operates also as satisfaction of the other.

*Restatement (Second) of Judgments* § 18 comment j (1982). The Restatement suggests that the judgment debtor may choose which of the judgments he desires to satisfy. However, the drafters clearly envisioned the context of two judgments within the United States, a context in which the dual currency problem does not arise. Transferring the debtor's choice rule into the international sphere would allow the judgment debtor to speculate without taking any risk. The principal debate in this area has been whether the judgment creditor should be allowed gains from fluctuation without risk (breach-day rule) or whether he should be required to assume the fair risks of speculation (judgment-day rule). However that choice is made, there is no sound basis for selecting a rule of *debtor's* preference.[16]

Finally, LaBow contends that the District Court's ruling conflicts with the New York Court of Appeals' decision in *In re James' Will, supra.* In *James,* a judgment debtor failed to pay a New York judgment. The judgment creditor obtained an enforcing judgment in France. The debtor paid the amount of the French judgment in depreciated francs[17] and sought a declaration in

---

can judgment must be converted to dollars as of the date of payment.

**16.** This suggestion was made by the trial court in *In re James,* 128 Misc. 528, 535, 220 N.Y.S. 177, 183 (Sup.Ct.Ulster Co.), *rev'd,* 221 A.D. 321, 223 N.Y.S. 174 (3d Dep't 1927), *rev'd,* 248 N.Y. 1, 161 N.E. 201 (1928). The court relied uncritically on the domestic rule that satisfaction of one judgment operates to satisfy the other. As authority, it cited cases involving satisfaction of one of two American judgments or satisfaction of a New York judgment by one of several joint tortfeasors. Although the Court of Appeals ultimately decided *James* on choice of law grounds, *see infra,* the Supreme Court's opinion is some evidence of New York's substantive law on satisfaction of judgments. However, we are not required to accept a trial court's view of state law if we believe that the state's highest court would disagree. *See West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940). Because New York's breach-day rule is incompatible with a satisfaction rule of debtor's preference, we believe the

New York Court of Appeals would apply the satisfaction rule described in the text.

**17.** The French court apparently allowed the judgment debtor to satisfy part of the French judgment in dollars, converted as of the date the petition was filed in the French action. *See.In re James, supra,* note 14, 128 Misc. at 535–36, 220 N.Y.S. at 184. Such a conversion allows the debtor to speculate on currency fluctuation without risk between the date of the petition and the date of payment. *See* note 15, *supra,* for the proper conversion rule. Had the New York courts held that the judgment debtor could pay part of his French judgment in depreciated dollars and then, when the direction of currency fluctuation changed, the rest in depreciated francs, *James* would suggest that New York was inclined toward a debtor's choice rule. However, the conversion of dollars credited against the French judgment was never an issue in *James,* or in the French courts, because the parties agreed to convert these dollars as of the date of the petition. The only issue was whether the judgment debtor could satisfy his remaining obligation in depreciated francs.

New York that the American judgment had been satisfied. The Court of Appeals ruled that the New York judgment had been satisfied. LaBow views *James* as holding that satisfaction of either judgment extinguishes the other judgment. Competex views *James* as holding that the enforcing judgment must be satisfied in local currency.

Though *James* is not an opinion of absolute clarity, we believe that both parties misread it. We think the Court of Appeals resolved the satisfaction issue by applying choice of law principles. Since the judgment creditor had chosen to enforce his New York judgment in France, instead of executing on his New York judgment, the Court viewed the French judgment as primary and held that French law should determine the satisfaction question.[18] It viewed the New York judgment as "merged" into the French judgment. 248 N.Y. at 8, 161 N.E. at 203. The Court of Appeals held that, since the French judgment had been satisfied under French law, the New York judgment had been satisfied.[19]

*James* is pertinent only as authority on the choice of law rule New York will apply in the satisfaction context: New York will apply the law of the enforcing jurisdiction. In the instant case, New York would apply its own substantive law. Since neither *James* nor any other New York decision supplies a New York answer to the substantive question, we must predict the law the New York Court of Appeals would apply. We predict that, where New York law applies, the Court of Appeals would require payment of a New York enforcing judgment in the specified dollar amount or its equivalent value at the date of payment to safeguard the policy underlying the breach-day rule.[20]

### Conclusion

The order of the District Court is affirmed.

---

**18.** French law apparently regarded the New York judgment as primary and its own judgment as merely a collection mechanism. *See* 248 N.Y. at 5, 161 N.E. at 202. Thus, France would probably have applied New York law to the satisfaction question. Faced with a *renvoi* problem, the New York Court of Appeals chose to apply the substantive, rather than the conflicts, law of France.

**19.** *James* was questioned in Reese, *The Status in This Country of Judgments Rendered Abroad,* 50 Colum.L.Rev. 783, 798–99 (1950).

**20.** If *James* is viewed as announcing general principles of substantive law rather than a conflicts rule, then *James* is authority for the rule that the enforcing judgment is primary and must be satisfied according to its own terms. The Court of Appeals noted that, had the franc appreciated, the judgment creditor could have demanded payment in francs because "[a]fter the translation of the judgment, [the judgment debtor's] liability was in francs alone." 248 N.Y. at 6, 161 N.E. at 202.