**NIKIMIHA SECURITIES LTD.**

v.

**The TREND GROUP LTD. and Jeffrey K. Rafsky.**

Civ. A. No. 84–2247.

United States District Court, E.D. Pennsylvania.

Aug. 19, 1986.

Jeffrey L. Pettit, Hepburn, Willcox, Hamilton and Putnam, Philadelphia, Pa., for plaintiff.

Richard M. Kraver, Kraver & Parker, New York City, for defendants.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

Plaintiff Nikimiha Securities Ltd. ("Nikimiha") filed this complaint to recover on bills of exchange and promissory notes from defendant The Trend Group Ltd. ("Trend") and guarantees from defendant Jeffrey K. Rafsky ("Rafsky"). Following denial of defendants' motion to transfer pursuant to 28 U.S.C. § 1404(a) and plaintiff's motions for default judgment and summary judgment, a bench trial was held on October 17–18, 1985. The court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52 follow.

### Findings of Fact

Plaintiff Nikimiha is a corporation organized and existing under the laws of England with its principal place of business in London, England.

Defendant Trend is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Valley Forge, Pennsylvania.

Defendant Rafsky is a citizen of the Commonwealth of Pennsylvania.

On August 9, 1983, Trend, through its president, Rafsky, executed a four-page Letter Agreement known as the Facility Agreement. (Ex. N–2). The Facility Agreement, which was prepared by Nikimiha, established a 700,000 Pounds Sterling line of credit for the financing of imports and purchases. The Agreement provided that the resulting debt would be evidenced by bills of exchange. The Facility Agreement also required:

a. Nikimiha to pay Trend's supplier upon the shipment of goods to Trend;

b. Trend to pay Nikimiha 180 days after Nikimiha's payment to Trend's supplier;

c. Trend to bear the risk of currency fluctuation unless Nikimiha was instructed to cover the risk on Trend's behalf;

d. Trend to purchase insurance to cover transactions under the Facility Agreement; and

e. Trend's shareholders to guarantee Trend's indebtedness to Nikimiha.

Since Trend intended to purchase three racehorses, Nikimiha asked that Trend accept three blank bills of exchange. Rafsky, on behalf of Trend, signed an endorsement "Accepted Payable at _____ for The

Trend Group Ltd." on each of the bills. (Reply to Request for Admissions, ¶ 9).

On August 26, 1983, and again on September 2, 1983, pursuant to the Facility Agreement, shareholders of Trend—defendant Rafsky, Donald C. Whirley, and Weld Monde Ltd.—executed a guarantee securing Trend's commitments. (Request for Admissions, ¶ 14; Ex. N–3, N–4).

Mossvend Ltd. ("Mossvend"), a limited liability company under the laws of England, was formed in 1979 by Trend through its English solicitors. (Tr. 1.42).

Business was transacted between Mossvend and Trend from 1980 and 1983; "there was a continuing interrelationship ... between the two companies." (Tr. 1.44).

Trend imported racehorses from England. On several occasions, Trend purchased racehorses from Mossvend. On August 25, 1983, Trend and Mossvend executed three contracts; each contract provided for the sale of a certain horse by Mossvend to Trend. The three horses and the corresponding purchase prices are:

What Lake, 273,000 Pounds Sterling (Ex. D–B);

First Groom, 208,200 Pounds Sterling (Ex. D–D); and

Bold Foil, 192,000 Pounds Sterling (Ex. D–G).

On August 28, 1983, these three horses were shipped from England to New York by air transport; on August 31, 1983, they were received in New York by Trend's agent. (Reply to Request for Admissions, ¶ 18). Rafsky acknowledged receipt of each horse by separate letter. (Ex. N–11, What Lake; Ex. N–24, First Groom; Ex. N–25, Bold Foil).

Trend instructed Nikimiha to pay Mossvend upon shipment 273,000 Pounds Sterling for the racehorse What Lake, 208,200 Pounds Sterling for the racehorse First Groom, and 192,000 Pounds Sterling for the racehorse Bold Foil. (Reply to Request for Admissions, ¶ 10; Ex. N–5).

Nikimiha paid Mossvend 273,000 Pounds Sterling for What Lake and 400,200 Pounds Sterling for First Groom and Bold Foil in accordance with the instructions received previously from Trend.

On September 5, 1983, Nikimiha, having advanced 673,200 Pounds Sterling to Mossvend on Trend's behalf, completed two bills of exchange. It completed one Bill of Exchange previously executed in blank by inserting the amount of 281,913.80 Pounds Sterling and a due date of February 24, 1984, 180 days from the date of shipment of What Lake. The amount represented the funds advanced to Mossvend for the racehorse What Lake, commissions and other expenses allowed by the Facility Agreement. The amount is consistent with Invoice 1148, received by Trend on or about September 5, 1983. (Replies to Request for Admissions ¶¶ 25 and 26).

Nikimiha completed the second Bill of Exchange by inserting the amount of 413,-263.29 Pounds Sterling and a due date of February 24, 1984, 180 days from the date of shipment of First Groom and Bold Foil. The amount represented the funds advanced to Mossvend for the racehorses First Groom and Bold Foil, commissions and other expenses under the Facility Agreement. The amount is consistent with Invoice 1149, received by Trend on or about September 5, 1983. (Replies to Request for Admissions ¶¶ 31 and 32).

On February 24, 1984, Nikimiha by Telex demanded immediate payment of the bills of exchange by Trend. (Ex. N–30).

Trend, responding to Nikimiha's demand by Telex, acknowledged its obligation to Nikimiha and offered to pay Nikimiha by March 9, 1984. (Ex. N–31).

When Trend failed to pay Nikimiha by March 9, 1984, as it had promised, representatives of Nikimiha, Drummond Millis and Neil Donnelly, visited Trend's offices in Valley Forge, Pennsylvania to discuss payment of the defaulted bills with Rafsky and William H. Klein, Vice-President of Trend. As a result of that meeting, Trend executed two promissory notes, one in the principal amount of 413,623.29 Pounds Sterling with interest thereon at 12.5% and

the other in the principal amount of 218,-913.80 Pounds Sterling with interest thereon at 13%. The promissory notes, by their express terms, arise out of and are subject to the terms of the Facility Agreement. (Ex N–34; N–35).

William Klein, Vice-President of Trend, testified that the parties intended the notes to effect a novation. His testimony was not credible.

Stephen E. Rogers, Director of International Relations for Trend, testified on behalf. of defendants with respect to their affirmative defenses. His testimony was not credible.

The parties did not intend the notes to effect a novation; the parties intended the notes to supplement rather than replace the bills of exchange.

Nikimiha reserved its rights against Rafsky in the event of a novation; Rafsky consented to this reservation of rights.

Trend delivered two checks concurrently with the execution of the notes: the first, in the amount of $100,000, was payment of the first installment on each of the notes; and the second in the amount of $70,225.54, was payment of aggregate accrued interest. (Reply to Request for Admissions, ¶ 41; Ex. N–33).

Trend informed Nikimiha by letter dated March 12, 1984 that Trend's failure to give consent to the deposit of these checks by March 28, 1984 would be considered a default under the notes. (Ex. N–33).

On March 12, 1984, Nikimiha delivered to Rafsky letters addressed to Weld Monde, Whirley and Rafsky, dated March 13, 1984, that notified them of its agreement to negotiate a rescheduling of the debt, their obligation of full reimbursement of the debt under the guarantee and their continuing liabilities on the guarantees executed pursuant to the Facility Agreement should Trend default on the promissory notes. (Reply to Request for Admissions, ¶ 42; Ex. N–38).

Trend failed to give its consent to the deposit of the two checks prior to the close

of business on March 28, 1984. (Ex. N–46; Rafsky's Deposition, p. 78).

No payments have been made on the bills of exchange or the promissory notes to Nikimiha by Trend, Weld Monde, Rafsky or Whirley. (Reply to Request for Admissions, ¶ 44).

Nikimiha received partial payment of approximately 630,000 Pounds Sterling on the Trend obligation on September 30, 1984 from Export Credit Guarantee Department ("ECGD") under a policy insuring Nikimiha against default by Trend. ECGD is a Department of the Secretary of State for Trade for the United Kingdom. (Tr. 2.99–102).

Trend is liable to Nikimiha on the bills of exchange.

Rafsky is liable to Nikimiha on his guarantee.

**Discussion**

**I. Liability and Novation**

A. *Bills of Exchange*

The first issue is whether Pennsylvania or English law applies. This is a diversity case, so Pennsylvania's choice of law rules govern. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1308 (3d Cir.1978). Under Pennsylvania conflicts law, "the place having the most interest in the problem and which is the most intimately concerned with the outcome is the forum whose law should be applied." *Complaint of Banker's Trust Company,* 752 F.2d 874, 882 (3d Cir.1985). The Facility Agreement does not contain a choice of law provision. But whether Pennsylvania or English law applies is here immaterial because under both English and Pennsylvania law, Trend's acceptance of the bills of exchange created an obligation on its part to pay Nikimina the sums stated therein. A Bill of Exchange is a negotiable instrument evidencing a debt on the part of the acceptor. 4 Halsbury's Laws of Eng-

land ¶ 356 (4th Ed.1973); 13 Pa.C.S.A. 3413(a).[1]

## B. *Promissory Notes*

The promissory notes executed March 12, 1984 each state that they "shall *in all respects* be interpreted in accordance with the laws of England." (Emphasis supplied). (Ex. N–34, N–35). Nikimiha contends that in view of this language, English law controls whether or not the execution of these notes constituted a novation of the bills of exchange and the guarantee. Defendants argue whether or not there was a novation depends on the effect of the execution of the promissory notes on the bills of exchange and not on their interpretation; the notes were executed in Pennsylvania so defendants argue that Pennsylvania law controls.

But both parties agree that Pennsylvania and English law are identical on whether the execution of the promissory notes effected a novation of the prior debt evidenced by the bills of exchange and guarantee so that the court need not determine whether the law of Pennsylvania or England applies. Under Pennsylvania and English Law, the essential elements of a novation are displacement and extinction of a prior contract, substitution of a new contract, sufficient consideration therefor, and consent of the parties. *First Pennsylvania Bank N.A. v. Triester*, 251 Pa.Super. 372, 380 A.2d 826 (1977); 9 Halsbury Laws of England ¶ 580–584 (4th Ed.1974).

Each of the promissory notes explicitly preserves the obligations arising under the Facility Agreement:

This note evidences an obligation arising under the terms of the certain Facility Agreement dated August 9, 1983, between the undersigned and Nikimiha Securities Ltd., and is subject to all the terms and provisions and is entitled to all the benefits and security thereof.

(Ex. N–34, N–35). This demonstrates lack of intent to extinguish.

The bills of exchange were not surrendered to Trend or otherwise cancelled or satisfied. This also demonstrates lack of intent to extinguish.

On March 12, 1984, Nikimiha delivered to Rafsky letters dated March 13, 1984, addressed to Weld Monde, Whirley and Rafsky that expressly stated Nikimiha's expectation of full reimbursement under their guarantee and their continuing liabilities under the guarantee in the event that Trend defaulted on the promissory notes:

At the request of the Trend Group Ltd. we have agreed to negotiate a re-scheduling of this debt, however [sic] should such negotiations prove abortive we will look to you for immediate full reimbursement of our debt under the aforementioned guarantee.... Should the rescheduling be agreed and then subsequently be defaulted under by the Trend Group Ltd. We remind you of your continuing liabilities under the aforementioned guarantees....

(Ex. N–38). Rafsky failed to deny or contradict its terms.

William Klein, Vice-President of Trend, testified that Trend intended the promissory notes to constitute a novation. On direct examination, Klein testified that Trend intended the promissory notes to supercede the bills. (Tr. 2.61). On cross-examination, he claimed that he did not know of the existence of the bills of exchange. (Tr. 2.68). This inconsistency was not explained satisfactorily. (Tr. 2.69). Although the witness repeatedly declared his honesty (Tr. 2.73–74), as the immortal Bard observed, it would appear the witness doth protest too much.

Klein relied on a letter dated March 12, 1984 from Trend to Nikimiha to which he signed an attestation (Ex. N–33) and stated that the purpose of the letter was to "be sure that the old notes, or the old, whatev-

1. At the close of plaintiff's case, defendants moved to dismiss the complaint on the ground that plaintiff, having failed to introduce evidence of payment by Nikimiha to Mossvend, had not established a prima-facie case of liability on the part of Trend or Rafsky. The court properly denied defendants' motion.

er they were, bills of exchange, had been superseded so that we could not be held responsible for both the new note and the old note." (Tr. 2.61). But the letter does not expressly or impliedly state such an intention. The letter states only that if Trend did not consent to the deposit of the checks executed with the notes, Trend would be in default on the notes. If Trend intended the letter to confirm that the notes superseded the bills, the letter could have so stated.

Klein also testified that the notes were intended to replace the bills of exchange because of defects with respect to insurance. (Tr. 2.64). If so, the insurance defense would have been raised at the outset of this litigation rather than belatedly in response to plaintiff's motion for summary judgment. Klein's testimony as a whole is not credible.

Defendants also argued a novation was intended because of certain differences between the terms of the bills and notes (repayment dates, interest rates, commissions, delinquency charges, and so on). (Tr. 1.92–94). The notes do differ from the bills, but it does not follow that the parties intended them as substitutes. A subsequent agreement may supplement rather than replace a prior agreement with differing terms. The differences between the terms of the bills and the notes do not manifest an intent to effect novation and the manifest intent of the parties must govern.

Defendants may have subjectively intended the promissory notes to effect a novation. But this intention was not communicated to or agreed to by Nikimiha. (Tr. 2.73). The notes cannot be effective in accordance with defendants' alleged subjective intent when that intent is inconsistent with the clearly manifested intent of both parties.

■ But even if the promissory notes effected a novation, Rafsky would remain liable on his guarantee to Nikimiha. Nikimiha contends English law controls; under English law a novation does not discharge a guarantor where the creditor reserves his rights against him with or without the consent or knowledge of the guarantor; 20 Halsbury's Laws of England § 266 (4th Ed.1978). Defendants contend that Pennsylvania law controls and that under Pennsylvania law a novation would discharge the guarantor unless the guarantor consented to Nikimiha's reservation of rights against him; 74 Am.Jur.2d Suretyship ¶ 60. But whether Pennsylvania law or English law applies is immaterial because Rafsky did consent to Nikimiha's reservation of rights against him.

Nikimiha's rights against Rafsky were expressly reserved in the guarantee Rafsky signed:

It is agreed ... that you [Nikimiha] shall be at liberty without affecting in any way or waiving your rights hereunder against me/us [Rafsky] without notice to me/us to realise securities and to give time or to compound or make other arrangements with or grant other indulgence to the debtor....

(Ex. N–3). Rafsky, as signatory to the guarantee, consented to its terms. Nikimiha also reserved its rights against Rafsky in its letter to Rafsky of March 13, 1984, in which Nikimiha notified Rafsky of its intent to seek reimbursement on the guarantees in the event of Trend's default on the note. (Ex. N–33). Rafsky's consent to the guarantee and the term expressed therein, including the reservation of rights against him, is manifested by his failure to deny or contradict its terms as well as all the credible evidence of record.

## II. Defenses

### A. *Payment to Mossvend*

■ Defendants contended that there was no payment to Mossvend so that neither Trend nor Rafsky is liable to Nikimiha.

Plaintiff did not introduce a check evidencing payment to Mossvend (Tr. 2.101), but defendants admitted that the horses were shipped to them and received, (Reply to Request for Admissions, ¶ 19; Ex. N–11, N–24, N–25), so they had the benefit of the

payment by receipt of the property for which the payment was to have been made. Without an offer to return the horses or an explanation of why they were entitled to the horses without payment or why the horses would have been shipped without payment, the court credits the testimony of Steven Hiseman, Chairman of Nikimiha, that payment was made to Mossvend. (Tr. 2.101).

Defendants' argument that there was no payment is inconsistent with their response to Nikimiha's February, 1984 demand for payment when Rafsky by Telex to Nikimiha conceded the obligation and promised to pay March 9, 1984:

> ... We are absolutely responsible for the obligation to your firm and repayment was scheduled to tie into our receiving funds due to us from other sources. These funds were scheduled to be received by February 20, but now we have been advised that these funds will definitely be in our hands prior to March 9 and, at that time, we will make payment of the amount due plus all accrued interest. We would appreciate your patience in this matter and as stated, it will be paid within one weeks [sic] time....

(Ex. N–31). Trend knew there had been payment when it conceded its obligation to Nikimiha.

### B. *Failure to Use Best Efforts*

The contracts of sale and purchase of What Lake, First Groom and Bold Foil provide for payment 180 days after shipment. (Ex. D–B, D–D, D–G). Defendants contend that if plaintiff paid, it paid Mossvend prematurely because funds were wired to Mossvend on shipment. Defendants argue that plaintiff should not have paid Mossvend until 180 days after shipment; under the Facility Agreement Trend does not have to pay plaintiff until 180 days after plaintiff advances funds on its behalf, so that it claims defendants' obligation to Nikimiha did not come due until 360 days after the horses were shipped. Defendants claim they are entitled to a discount for the early payment because the Facility Agreement provides, on page four,

that Nikimiha would pay Trend's suppliers "on their best terms in order to secure maximum possible cash discount which will passed on to you in full."

■ The Facility Agreement also provides on page four: "[o]n presentation of documents as called for under our confirmation or letter of credit, we will pay the supplier on your behalf." (N–2). The parties intended payment on shipment. Consistent with the parties' intention, Trend expressly instructed Nikimiha by Telex to pay Mossvend on shipment of the horses and specified the amount to be paid for each horse:

> ... Please arrange to pay Mossvend Ltd. ... for the three horses as listed below:
> What Lake Pounds Sterling 273,000
> Bold Foil Pounds Sterling 192,000
> First Groom Pounds Sterling 208,200
> I have informed Mossvend to look to you for payment on shipment....

(Ex. N–5).

Defendants' argument that Nikimiha prematurely paid Mossvend is inconsistent with its Telex response to Nikimiha's February, 1984 demand for payment when Rafsky conceded its obligation and promised to pay Nikimiha by March 9, 1985. Had the parties intended repayment to Nikimiha in no less than 360 days (August 23, 1984), Trend would not have conceded its obligation and promised to pay by March 9, 1984.

■ Trend's contracts with Nikimiha and Mossvend are inconsistent: Nikimiha was obligated to pay Mossvend on shipment but Trend was not obligated to pay Mossvend until 180 days after shipment. But Nikimiha protected itself against such an inconsistency; the Facility Agreement provides on page 4 that any agreement between Trend and its suppliers would have no effect on Trend's obligation to Nikimiha under the Facility Agreement:

> Our relationship with you is purely a financial one and we neither have nor will accept any responsibility whatsoever

under or for any contract between you and your suppliers.

(Ex. N–2). Any agreements between Mossvend and Trend calling for payment 180 days after shipment had no effect on Trend's obligation to Nikimiha. Nikimiha was obliged to pay Mossvend on shipment. If Trend is entitled to a discount because of Nikimiha's proper but early payment to Mossvend, that discount must come from Mossvend, Trend's supplier, not from Nikimiha, its financier.

### C. *Interest Rate*

Defendants contend that the effective interest rate on the transactions under the Facility Agreement was at least 43%: (1) a 12.5% or 13% per annum base rate; (2) 3.25% commission over 180 days (6.5% per annum); and (3) a 2% per month delinquency charge (24% per annum). (Tr. 1.64–68; Tr. 1.126—134; Ex. D–K). Defendants allege this effective interest rate is exhorbitant under the English Consumer Credit Act of 1974 so that an English court would set aside or revise the claim. (Tr. 1.130–132). Stephen E. Rogers, Director of International Relations for Trend, testified that English counsel had told him an effective interest rate of approximately 44% is exhorbitant under English law. While admissible (Fed.R.Civ.P. 44.1), this evidence is unpersuasive.

Plaintiff, citing Part II, Paragraph 8 of the Consumer Credit Act of 1974 (the "Act"), argues that the Act does not apply to these transactions because they involve more than 5,000 Pounds. Part II, Paragraph 8 of the Act provides that:

(I) A personal credit agreement is an agreement between an individual ('the debtor') and any other person ('the creditor') by which the creditor provides the debtor with credit of any amount.

(2) A consumer credit agreement is a personal credit agreement by which the creditor provides the debtor with credit not exceeding [Pounds] 5,000.

But the extortionate credit provisions are not limited to transactions involving less than 5,000 Pounds. Section 137 of the Act provides, in pertinent part,

(I) If the court finds a credit bargain extortionate it may reopen the credit agreement so as to do justice between the parties.

(2) In this section and sections 138 to 140—

(a) 'credit agreement' means any agreement between the individual (the 'debtor') and any other person (the 'creditor') by which the creditor provides the debtor with credit of any amount,....

■ Although the extortionate credit provision is not limited to transactions involving less than 5,000 Pounds Sterling, it is limited to transactions in which the debtor is an individual; § 137(b)(2) of the Act. Under § 189(I) of the Act, an individual "includes a partnership or other unincorporated body of persons not consisting entirely of bodies corporate." Trend is a corporation so that it is not a debtor within the meaning of the Act; therefore, the Facility Agreement and Bills of Exchange are not subject to the extortionate credit provisions.

■ Defendants contend that even if the extortionate credit provisions do not apply to Trend, Rafsky, an individual, can have the benefit of this provision. Although § 139(I) of the Act provides that the court can reopen a credit agreement on the ground that it is extortionate at the instance of the surety, the surety can only do so if the agreement is a credit agreement within the meaning of §§ 137 to 140, that is, if the debtor is an individual. Since here the debtor, Trend, is a corporation and not an individual, the guarantor, Rafsky, cannot benefit from the extortionate credit provisions because under the Act the surety's rights are no greater than the debtor's.

### D. *Insurance and Transportation Payments*

Defendants contend that they were responsible for the costs of insurance and transportation for the horses and that Nikimiha improperly paid Mossvend 49,200

Pounds Sterling for insurance and 9,000 Pounds Sterling for transportation. Therefore, defendants claim they are entitled to a credit in the amount of 58,200 Pounds Sterling. (Tr. 1.68–72; Tr. 1.76–87; Tr. 1.95–98; Tr. 2.15–31). Some of the money Nikimiha advanced to Mossvend did include insurance and transportation for the horses:

Ex. D–A Mossvend invoice to Nikimiha recites a purchase price for What Lake of 250,000 Pounds Sterling and includes a 20,000–Pound Sterling charge for insurance and a 3,000–Pound Sterling charge for transportation, for a total sum of 273,000 Pounds Sterling;

Ex. D–C Mossvend invoice to Nikimiha recites a purchase price for First Groom of 190,000 Pounds Sterling and includes a 15,200 Pound Sterling charge for insurance and a 3,000 Pound Sterling charge for transportation, for a total sum of 203,200 Pounds Sterling;

Ex. D–F Mossvend invoice to Nikimiha recites a purchase price for Bold Foil of 175,000 Pounds Sterling, and includes a 14,000–Pound Sterling charge for insurance and a 3,000–Pound Sterling charge for transportation, for a total sum of 192,000 Pounds Sterling.

Trend had an obligation to purchase insurance under the Facility Agreement:

*Insurance*

a) You undertake to maintain adequate insurance cover on all your premises and inventories, and a copy of such policy to be forwarded to us.

b) Marine Insurance: It is understood that you will arrange insurance cover for all transactions through your own open marine insurance policy. Our minimum requirements for marine insurance cover are: institute cargo clauses, all risks (including war) from warehouse in the country of origin to

your own warehouse for a minimum of 10% over and above the C & F value.

As we have a direct insurable interest in the merchandise, it would be helpful if you would please arrange for your marine policy to be claused to the effect that the respective rights and interests of Nikimiha Securities Ltd., London are noted. Will you please arrange to send us a copy of your marine insurance policy duly noted.

(Ex. N–2, pp. 2–3).

Defendants contend that the horses were covered under a number of Trend's insurance policies and that Trend paid C.O.D. charges so that Trend was improperly charged for insurance and transportation. (Tr. 1.84). But whether or not Trend paid for insurance and transportation for each of the horses is irrelevant.[2] Trend instructed Nikimiha by Telex to pay Mossvend 273,000 Pounds Sterling for What Lake, 208,200 Pounds Sterling for First Groom and 192,000 Pounds Sterling for Bold Foil:

TO: NIKIMIHA SECURITIES LTD.

FROM: THE TREND GROUP LTD.

0 HAVE SIGNED YOUR AGREEMENT AND AM ARRANGING FOR IT TO BE SENT TO YOU TODAY BY COURIER. PLEASE ARRANGE TO PAY MOSSVEND LTD, PRUDENTIAL HOUSE, WELLESLEY [sic] ROAD, CROYDON. [sic] FOR THREE HORSES AS LISTED BELOW:

WHAT LAKE POUNDS STERLING 273,000

BOLD FOIL POUNDS STERLING 192,000

FIRST GROOM POUNDS STERLING 208,200....

(Ex. N–5). The amount Trend instructed Nikimiha to pay Mossvend for each horse is the amount of Trend's contractual obli-

---

**2.** It is far from clear that defendants paid for insurance and transportation. For example, defendants contend that the horses were covered under an insurance policy issued by Hartford. But that policy does not mention horses; it refers to automobiles, bulldozers and diesel en-

gines. Although its coverage was not limited to the specified items, it would appear that horses are outside the covered subject matter. Defendants other arguments with regard to insurance coverage and transportation payment are equally unpersuasive.

gation to Mossvend for the same horse. (Ex. D–B, D–D, D–G).

■ Defendants now contend that: the amount they authorized Nikimiha to pay was a maximum amount for each horse; they did not authorize Nikimiha to pay for insurance and transportation; and they were unaware of Nikimiha's payment to Mossvend for insurance and transportation until this litigation was commenced. (Tr. 2.28–30). But the amount of money Trend instructed Nikimiha to pay Mossvend was not a maximum amount but a sum certain; there was no ambiguity in Trend's instructions.

Defendants claim they were unaware that the sums Nikimiha advanced covered insurance and transportation. But the invoices from Nikimiha to Trend for What Lake (Ex. D–E), First Groom and Bold Foil (Ex. D–H), dated and admittedly received by Trend on or about September 5, 1983 (Reply to Request for Admissions, ¶¶ 26 and 32), clearly provided that the money advanced to Mossvend included CIF (cost, insurance and freight). (Tr. 1.80). Defendants' denial they knew Nikimiha's payment to Mossvend included transportation and insurance is incredible.

■ Defendants also argue that the contracts between Mossvend and Trend did not require Trend to pay insurance. But section 6.2 of each contract for each horse provides that the seller shall,

Indemnify and hold the Buyer harmless from any injury to any person or damage to any property caused by the Horse, and arrange for third party liability insurance cover against such risks to ensure that the Buyer is named an additional insured on such policy.

(Ex. D–B, D–D, D–G). The purchase price of each of the horses included insurance. But even if the agreement between Mossvend and Trend did not authorize Mossvend to purchase insurance on Trend's behalf, Trend's liability to Nikimiha would not be reduced because the Facility Agreement expressly provided that the relationship between Nikimiha and Trend was unaffected by contracts between Trend and its suppliers.

### E. Commercially Unreasonable Disposition of Property

■ On October 30, 1984, Nikimiha instituted an action in the High Court of Justice, Queen's Bench Division, against Trend, Rafsky, Whirley and Weld Monde on the claims the subject of this action. (Ex. D–J). On October 31, 1984, the court issued an order granting plaintiff leave to serve a writ of summons on defendants and restraining defendant Rafsky from removing from the jurisdiction or otherwise disposing of his assets, including two horses known as Trendy Gent and Civilization. The court's order was granted upon plaintiff's agreeing "to abide by an Order of the court as to damages should the second defendant [Rafsky] suffer any by reason of this order which the plaintiff ought to pay." (Ex. D–J).

Rogers testified that: (1) at the time of distraint Trend had a contract of sale for two horses named Trendy Gent and Civilization in the amount of 320,000 Pounds Sterling; (2) the distraint was set aside as improper; (3) one of the animals was injured in an accident during the period of distraint so that its value diminished; and (4) both horses were subsequently sold for the total sum of approximately 10,000 Pounds Sterling. (Tr. 1.114–117). Defendants contend that the diminution in value of these other horses entitles Trend to an offset for the difference between the contract price prior to distraint and the sales price after distraint.

Plaintiff was required to abide by any order of the High Court of Justice, Queens Bench Division, with respect to damages resulting from the restraining order and that is the proper forum for defendants' claim arising out of an improper restraint. But in view of the default judgment entered against defendant in the High Court of Justice on December 3, 1984, in the amount of 695,177.09 Pounds Sterling (Ex. N–42), either the distraint was not set aside as defendants contend or the claim for damages for improper distraint was aban-

doned in the litigation giving rise to it. Plaintiff does not seek enforcement of the default judgment per se because it is unenforceable outside the United Kingdom. (Tr. 1.111).

### F. *ECGD Insurance*

At trial, defendants initially argued that they had no obligation to plaintiff because Nikimiha failed to purchase Export Credit Guarantee Department ("ECGD") Insurance as required by the Facility Agreement. The Export Credit Guarantee Department of the Secretary of State for Trade for the United Kingdom provides insurance in connection with the export or distribution of goods from the United Kingdom. Although the Facility Agreement does not expressly refer to ECGD insurance, defendants contended that it was their understanding that the 3–¼% commission provided for by the Facility Agreement was to purchase this insurance. (Tr. 1.50). Defendants argued that had they known that Nikimiha would not use the commission to purchase such insurance, they never would have executed the Facility Agreement or guarantee because this insurance was their protection and a condition precedent to any obligation to Nikimiha. (Tr. 1.109).

Defendants then called Stephen L. Hiseman, Chairman of Nikimiha, as of cross-examination. Hiseman testified that Nikimiha made an application to ECGD for insurance coverage on the export transaction at issue and that the application was granted to a limit of 700,000 Pounds Sterling. (Tr. 2.96). Hiseman also testified that Nikimiha was paid by ECGD on September 30, 1984 in the amount of approximately 630,000 Pounds Sterling. (Tr. 2.98–100).

Following Hiseman's testimony, defendants withdrew their argument that Nikimiha's failure to obtain ECGD insurance discharged them from obligation to Nikimiha (Tr. 2.130–131), and now argue that the payment to Nikimiha by ECGD made ECGD the real party in interest and failure to join ECGD compels dismissing the complaint or, in the alternative, crediting the insurance proceeds against any recovery by Nikimiha.

Plaintiff contends this defense was waived. Defendants argue there could be no waiver because plaintiff affirmatively withheld the material fact of payment of which defendants were unaware until its disclosure at trial.

On March 9, 1985, at the law offices of Kraver & Martin (now Kraver & Parker), Drummond B. Millis, a former employee of Nikimiha, was deposed by defendants. Defendants attached the deposition as Exhibit G to the affidavit of Steven E. Rogers, dated September 9, 1985, filed with this court on September 11, 1985 in opposition to plaintiff's motion for summary judgment. Excerpts from that deposition, offered by defendants in support of their motion for summary judgment (pages 19–23), follow:

Q. Did you have any subsequent dealings or conversations or communications with Moss Vend [sic] or Mr. Hunter?

A. Yes. I have already stated that this transaction was, in short, to cover us or cover Nikimiha against part of any loss that might occur. When we claimed under this insurance policy, we were requested by our insurers to obtain a statement from Moss Vend [sic] that they physically owned the horses prior to exportation. I did so.

. . . . .

Q. When you referred to the credit insurer having suggested to you that you communicate with Moss Vend with respect to their [sic] being a joint action against Trend Group, to what credit insurer are you referring to?

A. I was referring to that department known as ECGD.

Q. Was there a particular broker that that insurance was placed through?

A. Nikimiha does have a broker, Jardine Credit Insurance, who were not involved in the day-to-day operating of the policy.

Q. Did they place the policy?

A. Yes. . . .

. . . . .

Q. What communication did you have, you personally or Nikimiha with the export credit guarantee?

MR. PETTIT: I'm going to object, again on the basis, as I said before.

MR. NULL: Do you direct him not to answer?

MR. PETTIT: Yes. I have an objection which I made at the outset of the deposition, and that is that inquiries into communications between the plaintiff and their credit insurer which has been identified as ECGD, and that objection is continuing, and I am directing the witness not to answer.

MR. NULL: Off the record. [Discussion off the record] . . .

Q. Do you know whether Nikimiha ever received any payments from ECGD with respect to this—

MR. PETTIT: Objection, again, on the same basis. I instruct him not to answer.

MR. NULL: You believe that is not relevant to this case?

MR. PETTIT: Absolutely. It is not relevant.

MR. NULL: It is a question of a real tarty [sic] interest here.

MR. PETTIT: You have raised that as a defense and I think you waived that by not filing a Rule 12–8 VI motion.

MR. NULL: I don't believe there has been any waiver of that. In fact, this is the first time I heard that there may even have been a payment by ECGD.

MR. PETTIT: Whether there has been a payment or not, first of all, does not effect the real party in interest unless there has been some assignment of the claim.

Q. Mr. Millis, do you know whether there has been any assignment of the claim by Nikimiha against Trend?

MR. PETTIT: Objection on the same basis.

These excerpts demonstrate that defendants were aware of the existence of ECGD insurance and the possibility of payment in March, 1985, long before trial.

■■■ Defendants contend that Nikimiha improperly denied discovery relating to an insurance payment to Nikimiha by ECGD. But defendants were sufficiently on notice of the matter to seek the aid of the court. Defendants contend that their proposed findings of fact and conclusions of law, pretrial memorandum and oral argument in opposition to plaintiff's motion for summary judgment preserved the issue. But defendants were then arguing the absence of ECGD insurance not payment under an ECGD policy. Finally, defendants contend that Nikimiha failed to maintain its claim of their waiver. But Nikimiha objected to the defendants' calling Hiseman as their witness; this general objection covered the substance of his testimony that Nikimiha obtained ECGD insurance and was paid by ECGD. Plaintiff has sufficiently preserved its claim that defendants waived any real party in interest defense.

■■■ The real party in interest defense is "for the benefit of a defendant, and should be raised in timely fashion or it may be deemed waived." *Audio Visual Marketing Corp. v. Omni Corp.*, 545 F.2d 715, 719 (10th Cir.1976). Defendants did not raise the real party in interest defense until the close of the second day of trial. This was not timely and the defense was actually waived.

■■■ But even if there were no waiver, the defense fails. ECGD is a real party in interest only if it has legal right, under the applicable substantive law, to enforce Nikimiha's claim against Trend. 3A. J. Moore and J. Lucas Moore's Federal Practice, ¶ 17.07 ("Real Party in Interest Construed—in General") (2d Ed.1985); *White Hall Building Corp. v. Profexray, Div. of Litton Indus., Inc.*, 387 F.Supp. 1202, 1204 (E.D.Pa.1974), *aff'd memo*, 578 F.2d 1375 (3d Cir.1975). Because payment was made in England by a department of the United Kingdom to a corporation organized under the laws of England under a policy issued

in England, the substantive laws of England determine whether ECGD has a legal right to enforce Nikimiha's claim.

■ Title 25 Halsbury's Law of England ¶ 527 (4th Ed.) provides:

In the absence of a formal assignment of the right of action the insurers cannot sue a third party in their own names; they must bring the action in the name of the assured. On receiving a proper indemnity against costs, it is his duty to permit his name to be used in such action(s).

Plaintiff contends because no assignment was made, ECGD is not a real party in interest. But the absence of an assignment does not preclude ECGD from bringing an action; ECGD could bring an action in the name of the insured so that under English law, ECGD is a real party in interest.

■ But Nikimiha was also a real party in interest because ECGD only partially paid defendants' debt; Nikimiha had a right to initiate this claim. So there were two real parties in interest and the issue is whether both would need to have been joined were there no waiver, that is, whether Nikimiha is a necessary party under Fed.R.Civ.P. 19(a). Rule 19(a) provides, in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party....

English law allows the insured to recover from the insurer and from a third party so long as the insured remits to the insurer his recovery from the third party to the extent there is a double recovery:

The principle that payments made by third parties in compensation for a loss must be taken in to account when paying out under an insurance policy applies to payments received from third parties after payment of the loss in full under the policy. As the assured has already been indemnified by the insurers, if he is to retain the money paid by the third party, he will be indemnified twice over. Therefore, he must account to the extent to which, when added to the policy money, it exceeds the amount required for a full indemnity.

Title 25, Halsbuty's Law of England ¶ 532 (4th Ed.).

■ Hiseman testified that if Nikimiha recovers in this action, it will remit an allocated portion of the recovery to ECGD (Tr. 2.106) as it must under English law. Therefore, ECGD is not prejudiced by not having been joined nor have the defendants been prejudiced; defendants will not be obligated to ECGD because ECGD will not and cannot bring an action against them; Nikimiha must and will remit a portion of its recovery to ECGD. Finally, Nikimiha is not prejudiced as a result of the nonjoinder of ECGD; adequate relief will be afforded Nikimiha without ECGD's joinder.

For over two years, since February of 1984, defendants have wrongfully resisted paying Nikimiha. Defendants have prolonged this litigation by failing to comply with the court's Local Rules as well as the Federal Rules of Civil Procedure and belatedly invoking a myriad of weak defenses. It is not in the interest of the administration of justice to require another trial with the joinder of ECGD to permit defendants to avoid payment even longer when the legal rights and responsibilities of all the parties on the bills of exchange and guarantee have been dealt with adequately and

fairly in this proceeding.[3] For all the foregoing reasons ECGD is not a necessary party under Fed.R.Civ.P. 19.[4] For the same reasons, defendants are not entitled to a credit in the amount of ECGD's payment to Nikimiha.

## III. Damages

### A. *Items of Damage*

The bills of exchange at issue were executed and payable in London in English currency; the holder of the bills is a corporation organized under the laws of England. Therefore, the issues on damages are governed by English law. In effect, by discussing only English law with regard to the bills of exchange, defendants concede this.

The bills of exchange provide the interest to which Nikimiha is entitled on the principal until maturity, February 24, 1984. The Bill of Exchange for What Lake sets forth an interest rate of 13%. The Bill of Exchange for Bold Foil and First Groom sets forth an interest rate of 12.5%.

■ English law refers to interest accruing after maturity as damages; the rate of interest is left to the discretion of the court. The rate is often the rate set forth in the bill of exchange if it is reasonable. The rate set forth in these two bills of exchange is reasonable. Trend expressly agreed to pay these rates by executing the promissory notes. Damages will be assessed at the same rates set forth in each bill of exchange: 13% and 12.5% (Rink Affidavit).

■ Nikimiha is also entitled to commissions. The Facility Agreement provides for an additional Commission of 2% of the principal amount for each thirty (30) days that the bill remains unpaid.

### B. *Exchange Rate*

The parties agree that a United States court cannot render a judgment in foreign currency; its judgment must be expressed in United States Currency. *Baumlin & Ernst Ltd. v. Gemini Ltd.*, 637 F.2d 238, 244, n. 9 (4th Cir.1980); *Shaw, Savill, Abion & Co., Ltd. v. The Fredericksburg*, 189 F.2d 952, 955 (2d Cir.1951); *but see Competex S.A. v. Labow*, 783 F.2d 333, 337 (2d Cir.1986) (judgments in foreign currencies may be permissible with repeal of § 20 of the Coinage Act of 1792, 31 U.S.C. § 371).

The court must determine the date at which the exchange rate for the foreign currency is determined. This is a diversity action so in deciding whether Pennsylvania or federal law applies, the court considers whether the issue is substantive or procedural. If the issue is substantive, Pennsylvania law applies but if procedural, federal law applies.

■ Pennsylvania's substantive law includes its choice of law rules. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Klaxon Co. v. Stentor Electronic Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Albright v. R.J. Reynolds Tobacco Co.*, 531 F.2d 132 (3d Cir.1976). If Pennsylvania law applies, there is a choice of law issue. Under Pennsylvania choice of law

---

**3.** Stephen Rogers testified that Trend has genuine defenses to any claim by ECGD that are different in law and in fact from Nikimiha so that a new trial should be granted in which ECGD is joined; Trend is entitled to offset its export credit receivables against an export credit payable involving ECGD or its American equivalent, the Foreign Credit Insurance Association. (Defendants' Post-Trial Memorandum of Law, pp. 5–6, November 7, 1985; Tr. 1.105). But Rogers' testimony was neither credible nor corroborated. Moreover, defendants do not address the court's jurisdiction to effect a compulsory joinder of a department of a foreign state.

Defendants have not persuaded this court that its failure to grant a new trial will prejudice them unless paying a debt owed for over two years is legally cognizable prejudice.

**4.** Plaintiff contends that it not only had a legal right but also a contractual duty to institute this action and then remit a portion of its recovery, if any, to ECGD. The contract between Nikimiha and ECGD has not been considered by this court in deciding this issue because it was not introduced into evidence.

rules, arguably English law applies. However, neither plaintiff nor defendants raised this issue in their extensive post-trial submissions or in connection with plaintiff's motion for summary judgment where the issue was briefed in depth. The Advisory Committee's notes to Fed.R.Civ.P. 44.1 make clear that the court could apply foreign law even if not requested by the parties but we decline to do so here. The law of the forum may be applied where the parties did not argue the application of foreign law, even though the forum's choice of law may have called for the application of foreign law. *Walter v. Netherlands Mead N.V.*, 514 F.2d 1130, 1137, n. 14 (3d Cir.1975); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 866 (2d Cir.1981), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).

There is no decision of the Pennsylvania Supreme Court determining the date for conversion of foreign currency in a breach of contract action so that this court must predict how the Supreme Court would decide the issue. *Rabatin v. Columbus Lines*, 790 F.2d 22, 74 (3d Cir.1986), *citing Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1982). Although this court is bound only by a decision of the Pennsylvania Supreme Court, well-reasoned opinions of the Pennsylvania Superior Court are helpful in predicting what the Supreme Court would decide. These decisions are given "proper regard" but not "conclusive effect." *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662 (3d Cir.1980). But there is no decision of the Superior Court on this issue either.

In the absence of precedent, we believe the Pennsylvania Supreme Court would look to the Restatement of Foreign Relations Law of the United States (Tent. Draft No. 6 1985). Section 823 provides that the "conversion rate is to be made at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation." (Provision adopted on May 14, 1986). This rule prevents fluctuating exchange rates from causing the injured or non-breaching party to bear the loss. Here, defendants have resisted paying a debt owed for more than two years so that they should bear the risk of a fluctuating exchange rate.

The Court of Appeals for the Second Circuit has criticized the Restatement as an "extreme rule of creditor's preference that can enable the creditor to benefit from currency fluctuations." *Competex S.A. v. Labow*, 783 F.2d 333, 357 (2d Cir.1986). But the debtor can eliminate this "creditor preference" by paying the debt owed; here, had the debt been paid, the creditor might have invested in other currency so the creditor would not necessarily have been exposed to this exchange risk. Between the innocent party and the breaching party, the breaching party should bear the exchange risk. Therefore, we reject this criticism of the Restatement view.

Even if Pennsylvania would not adopt the Restatement view, such authority as there is makes it clear that the intention of the parties should control. *See Willing's Estate*, 292 Pa. 51, 140 A. 558 (1928). (Whether the gold franc or paper franc is the standard of currency for the payment of a testamentary annuity stated in francs determined by intent of testator.) The Facility Agreement, on page 3, states:

> We do not buy forward currency when confirming indents placed in a foreign currency unless we receive special instructions from you to do so. It must be clearly understood that in instances, where we are not instructed to make suitable cover on your behalf, all the exchange risks will be for your account.

Ex. N–2. Trend did not instruct Nikimina to cover the risk of exchange so that under the Facility Agreement, Trend was to bear the exchange risk.

Under federal law, the date at which the exchange rate for foreign currency is determined turns on the interpretation of two Supreme Court cases: *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925) and *Deutsche Bank Filiale Nurnberg v.*

*Humphrey,* 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926). In *Hicks,* a German firm owed a debt to an American company; the debt was payable in German Marks in the United States. The Court held the exchange rate on the date of breach applied. "When the contract was broken by a failure to pay, the American firm had a claim here, not for the debt, but, at its option, for damages in dollars." 269 U.S. at 80, 46 S.Ct. at 47. In *Deutsche Bank,* a German bank refused to return marks on deposit upon the American depositors demand. The depositor sued in the United States under the Trading with the Enemy Act to recover his money which had been seized by the World War I American Property Custodian. The Court held the exchange rate on the date of judgment applied. "In this case, unlike Hicks ..., at the date of the demand the German Bank owed no duty to plaintiff under our law." 272 U.S. 518–519, 47 S.Ct. at 166.

Two approaches have emerged to reconcile *Hicks* and *Deutsche Bank.* Under the first approach, the judgment day rule applies when the contract is payable in a foreign country in that country's currency; the breach day rule applies when the payment is to be made in the United States. *See, e.g., Paris v. Central Chiclera,* 193 F.2d 960, 962 (5th Cir.1952). Under the second approach, the judgment day rule applies if the obligation arises entirely under foreign law; the breach day rule applies if the plaintiff could recover under American law at the time of breach. *In re Good Hope Chemical Corp.,* 747 F.2d 806, 811 (1st Cir.1984), *cert. denied,* 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985). There is no recent Court of Appeals case in the Third Circuit addressing this issue.

In determining in a diversity action whether a federal court in a diversity action should apply state law, the "mere labeling of the state law as 'substantive' or 'procedural' does not advance the analysis." *Jarvis v. Johnson,* 668 F.2d 740, 743 (3d Cir.1982). The court must consider the twin aims of *Erie:* discouragement of forum shopping and avoidance of inequitable administration of the law. *Hanna v.*

*Plummer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1968). The "unfairness" and "forum shopping" that the court in *Erie* desired to prevent are likely to occur and indeed are inevitable where the difference between the application of a state or federal law would be dispositive of the outcome of the suit. *Jarvis,* 668 F.2d at 743.

The appropriate inquiry is whether the application of state rather than federal law would determine the outcome of the litigation. *Id.* "[I]n all cases, where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). The court must also consider whether there is an overriding federal interest in the application of the federal rule. *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

■ The exchange rate for foreign currency will affect the amount of damages that the creditor can recover. Therefore, like prejudgment interest (*Jarvis*) and delay damages (*Barris v. Bob's Drag Chutes & Safety Equipment,* 717 F.2d 52 (3d Cir. 1983), the decision whether or not to apply state law is outcome determinative.

If a state rule is not applied, forum shopping will occur. A defendant facing a suit demanding payment would seek removal when the federal rule was less favorable to the creditor. It would be inequitable to allow diverse defendants to have this advantage where similarly situated non-diverse defendants would not. There is no strong countervailing federal interest in the application of federal law and no harm to any federal policy or interest. Therefore, the issue is substantive and state law applies. *Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d 854, 866 (2nd Cir.1981), *cert. denied,* 459 U.S. 976, 103

S.Ct. 313, 74 L.Ed.2d 291 (1982). Under Pennsylvania law, Trend and its guarantor bear the risk of exchange.

 The date of breach is the date payment was due on the bills of exchange, February 24, 1984. On the date of the breach, February 24, 1984, the exchange rate of United States Dollars for Pounds Sterling was $1.47 (Public Release H.10 Noon-Buying Rate). On the date of judgment, August 19, 1986, the exchange rate of United States Dollars for Pounds Sterling was quoted at $1.50 on or about Noon on the New York Market. Therefore, the exchange rate on the date of judgment ($1.50) applies.

C. *Award*

Trend is obligated to Nikimiha on the Bill of Exchange for What Lake for: principal in the amount of $422,870.70 (281,913.80 Pounds Sterling); interest to 2/24/84 at 13%; damages from 2/25/84 to 8/19/86 at 13%; and additional commissions from 2/25/84 to 8/19/86. Rafsky is obligated to Nikimiha on his guarantee for same.

Trend is obligated to Nikimiha on the Bill of Exchange for Bold Foil and First Groom for: principal in the amount of $619,894.93 (413,263.29 Pounds Sterling); interest to 2/24/84 at 12.5%; damages from 2/25/84 to 8/19/86 at 12.5%; and additional commissions from 2/25/85 to 8/19/86. Rafsky is obligated to Nikimiha on his guarantee for same.

The parties shall attempt to agree on the precise interest, damages and additional commissions to date of judgment (applying an exchange rate of $1.50 per Pound Sterling) on or before August 27, 1986; otherwise, they shall submit their separate calculations on or before the same day.

**IV. Attorneys' Fees**

Under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), in diversity actions liability for fees is ordinarily considered substantive rather than procedural. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975); *Montgomery Ward & Co., Inc. v. Pacific Indemnity Co.,* 557 F.2d 51 (3d Cir.1977). Plaintiff contends that as the prevailing party it is entitled to attorneys' fees under English law. Pennsylvania courts generally adhere to the American Rule, that precludes the award of attorneys' fees except in exceptional circumstances. Therefore, whether plaintiff can recover attorneys' fees will depend on whether Pennsylvania or English law applies under Pennsylvania's choice of law rules. Plaintiff may file a fee petition addressing the choice of law issue within thirty (30) days of entry of judgment; if English law applies, consideration should be given to requesting determination of the fee by an English Taxing Master (with the charge paid by defendants). Defendants have a like time to respond.

Plaintiff contends it is entitled to fees and costs under 28 U.S.C. § 1927 in the alternative. Plaintiff may also address this issue within thirty (30) days and defendants have a like time to respond.

All facts referred to in this Discussion are incorporated in the court's specific Findings of Fact preceding this Discussion. All conclusions of law included in this Discussion are incorporated in this court's specific Conclusions of Law following this Discussion.

**Conclusions of Law**

This court has jurisdiction in this matter under 28 U.S.C. § 1332.

The Facility Agreement executed by Trend is a valid and enforceable agreement.

Each Bill of Exchange accepted by Trend is a valid and enforceable obligation of Trend to Nikimiha.

Trend is liable to Nikimiha on each Bill of Exchange.

The guarantee signed by Rafsky is a valid and enforceable obligation of Rafsky to Nikimiha.

Trend having failed to pay Nikimiha its obligation arising out of either Bill of Ex-

change, Rafsky is liable to Nikimiha on his guarantee.

The promissory notes issued by Trend in February, 1984, constitute valid and enforceable obligations of Trend to Nikimiha.

The promissory notes did not effect a novation releasing defendants from their obligations under the Facility Agreement, bills of exchange and guarantee.

Nikimiha did not pay Mossvend prematurely.

Nikimiha did not improperly pay Mossvend for transportation and insurance on the horses the subject of this action.

Recovery on the bills of exchange and guarantee is not barred by the extortionate credit provisions of the English Consumer Credit Act of 1974.

Defendants' liability to Nikimiha is neither precluded nor diminished by Nikimiha's disposition of defendants' collateral.

Defendants have waived the real party in interest defense and in any event the failure to join the ECGO does not preclude recovery by the plaintiff.

### FINAL JUDGMENT

AND NOW, this 19th day of August, 1986, in accordance with the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that JUDGMENT is entered in favor of plaintiff and against each defendant in the amount of $1,042,765.63 plus interest, damages and additional commissions.